**Laura HOLTZ, Plaintiff–Appellant,**

**v.**

**ROCKEFELLER & CO., INC., Defendant–Appellee.**

No. 00–7041.

United States Court of Appeals, Second Circuit.

Argued: Aug. 30, 2000.

Decided: July 10, 2001.

---

Laura Holtz, Plaintiff–Appellant, pro se.

Douglas W. Henkin, Milbank, Tweed, Hadley & McCloy LLP (Russell E. Brooks, of counsel), New York, NY, for Defendant–Appellee.

Before: NEWMAN, STRAUB, and SACK, Circuit Judges.

SACK, Circuit Judge.

Plaintiff–Appellant Laura Holtz, who was employed by Defendant–Appellee Rockefeller & Co., Inc. ("RCI") for approximately one year ending in August 1995, brought an action in the United States District Court for the Southern District of New York alleging that she had been subjected to various forms of employment discrimination on the basis of her age, sex, religion, and national origin. The district court granted summary judgment in RCI's favor on all claims, concluding that several of them were barred because Holtz had failed to raise them in the administrative charge she had previously filed with the Equal Employment Opportunity Commission ("EEOC"), and that Holtz had failed to make out a *prima facie* case of discrimination as to the remaining claims. We affirm the grant of summary judgment as to the claims not previously raised before the EEOC, as well as the claims of discrimination based on national origin, failure to promote, and wrongful discharge. We vacate the district court's rulings with respect to Holtz's claims of sexual harassment, retaliatory discharge, and failure to train because of age.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

■ We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."). "We may affirm the award of summary judgment on any ground with adequate support in the record." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir.2001) (citations omitted).

The recitation of "facts" upon which we are about to embark paints several RCI employees in decidedly unflattering colors. We therefore emphasize at the outset that because we are required to construe the evidence in the light most favorable to the plaintiff, and because most of the evidence she presents is her own testimony, the account that follows may not reflect the facts that will be found at trial.

## BACKGROUND

### General Background

Holtz, a woman of "English–German national origin" born on December 1, 1951, was employed by RCI from approximately May 1994 through August 18, 1995. She was initially hired as a temporary secretary for Stanley Cowan, head of RCI's Corporate Accounting department. Cowan subsequently offered Holtz a permanent position as an accounts payable clerk in the department. Holtz, an attorney whose goal was eventually to secure employment with a philanthropic foundation, accepted Cowan's offer but made it clear that she was not interested in the accounts payable position as a long-term job and was unlikely to remain for more than a year or two.

### Sexual Harassment

Holtz asserts that for several months during her tenure she was sexually harassed by her supervisor, Peter Mumbach, a senior accountant in Corporate Accounting. She stated in her deposition that Mumbach "grabb[ed]" her hand "constantly" or "daily," touching it "every time [she] would try to hand him a paper." She also testified that he "used to touch [her] hair a lot"; that he made "obscene leers at her"; and that he tried to peer down her blouse and up her skirt. Holtz further asserted that Mumbach made approximately ten or twenty remarks insinuating that she was "involved with or had [her] eye on" married men.

At his deposition, Mumbach denied ever touching Holtz's hand or hair or trying to look down her blouse or up her skirt. He apparently was not asked about the other forms of alleged harassment.

Holtz stated that Mumbach's harassment "was ongoing over months and months" and that "it [was] almost impossible for [her] to do [her] work without getting upset" when the harassment occurred. She testified that she complained about Mumbach's conduct to Cowan, who supervised both her and Mumbach, and to Marilyn Kempf Canterbury, RCI's Manager of Personnel Administration. Mumbach and Canterbury denied that Holtz's complaints could be construed as alleging sexual harassment. Holtz said she made numerous requests to have her desk moved away from Mumbach's and tried to keep her interaction with him "to the strictest minimum."

In June 1995, Cowan reprimanded Holtz for her ongoing effort to avoid contact with Mumbach. Cowan was apparently unhappy that Holtz declined to ask Mumbach to approve overtime work and pay. Cowan told Holtz: "Peter Mumbach is supervising you. You will get your orders from Peter Mumbach. You go to Peter Mumbach. He will give you your papers, you will give him papers."

Holtz complained about this incident to Mary M. Massimo, RCI's Director of Human Resources, alleging that Cowan had "publicly humiliated" her. Holtz testified that in explaining the incident to Massimo, she attempted to describe Mumbach's harassment and "burst into tears."

### Age Discrimination: Failure to Train and Promote

Holtz also claims that RCI withheld certain benefits from her because of her age. She first alleges that when Cowan offered her a full-time position as an accounts payable clerk, he promised to train her as an accountant. Although Holtz was trained in the duties of her own job, it is undisputed that Cowan did not train her in accounting. Holtz testified that when she asked Cowan why he was not training her, he said: "Laura, it's young women I like to train." It is undisputed that Holtz was not qualified for an accounting position at RCI

because she did not have an accounting degree.

Holtz next asserts that she was denied a promotion or transfer on the basis of her age. She told various RCI employees of her interest in working with an RCI-affiliated company in a position more directly related to philanthropy. Canterbury arranged job interviews for Holtz at Rockefeller Financial Services ("RFS") and the Rockefeller Brothers Fund, both not-for-profit institutions that are owned by members of the Rockefeller family but are legally distinct from RCI. Neither interview resulted in a job. Holtz testified that after the position with the Rockefeller Brothers Fund fell through, Canterbury told her that the person with whom she had interviewed at the Fund had said "she had no work for [an] attorney my age. . . . You will just have to leave altogether. We have nothing for you." Holtz interpreted these remarks as Canterbury "saying there was nothing for me. I was over the hill, so I should leave."

*Holtz's Termination*

Cowan's June 1995 confrontation with Holtz regarding her reluctance to deal directly with Mumbach set off a series of events that led to Holtz's termination. As noted, on June 29, 1995, Holtz complained to Massimo, the Director of Human Resources, that Cowan had "publicly humiliated" her during the incident. She told Massimo that Cowan "stood at [her] desk and just started screaming at [her], shouting at [her]," and that his tone was "harsh" and "insulting." Massimo investigated the complaint by interviewing Cowan and two witnesses. Cowan denied having raised his voice, and the witnesses said the conversation was "intense" but not particularly loud.

On July 17, 1995, Massimo met with Holtz to discuss the results of the investigation. At that meeting, Massimo broached the subject of Holtz's stated intention to remain at RCI for only a short time. Holtz confirmed that she was actively looking for another job. The contents of the conversation are otherwise in dispute: Massimo testified that Holtz said she would leave RCI no later than August 18, 1995; Holtz testified that Massimo pressured her to set a date certain for her resignation but that she refused to do so.

Later that day, Massimo had a second conversation with Holtz, this time together with John Leyden, RCI's Chief Financial Officer. Massimo and Leyden told Holtz that they viewed her earlier statement that she would leave by August 18 as a notice of resignation, which RCI accepted. Holtz made clear that she did not want to resign, even writing the words "I do not resign" on a napkin in front of Massimo and Leyden. Holtz also stated during the meeting that she "had been the subject of illegal treatment."

On July 18, 1995, Leyden delivered a memorandum to Holtz. It stated in part, "[W]e confirm our acceptance of August 18, 1995 as your effective resignation date." Holtz was asked to discontinue active employment immediately, although she received her full salary through August 18, 1995.

*Procedural History*

Holtz filed a charge of discrimination with the EEOC on September 6, 1995. She alleged the following forms of discrimination: (1) failure to train because of age; (2) sexual harassment by Mumbach; and (3) retaliatory discharge. Holtz also checked a box on the claim form indicating that she had been discriminated against on the basis of national origin, and alleged that "[her] supervisor, an Irish-american [sic], hired and trained women in their 20's who were of Irish national origins [sic]."

On October 24, 1996, Holtz received a "right-to-sue" letter dated October 21, 1996 from the EEOC. On December 17, 1996, Holtz initiated the present action by filing a complaint in the United States District Court for the Southern District of New York, asserting claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"). The complaint alleges that RCI discriminated against Holtz "for not being Irish and Catholic," as well as on the basis of her age and sex. As to specific discriminatory conduct, the complaint repeats the allegations in the EEOC complaint and alleges in addition that RCI retaliated against her for complaining about the alleged sexual harassment by failing to promote or transfer her and by denying her a bonus and overtime payments.

On November 17, 1999, the district court granted RCI's motion for summary judgment on all of Holtz's claims. *See Holtz v. Rockefeller & Co.*, No. 96 CIV. 9484(WK), 1999 WL 1043866, 1999 U.S. Dist. LEXIS 17682 (S.D.N.Y. Nov. 17, 1999). The court divided Holtz's claims into two categories: those included in her EEOC charge, and "additional claims" raised for the first time in the district court complaint. The first group consisted of the claims of sexual harassment, refusal to train because of age, retaliatory discharge, and an implied claim of discriminatory discharge. The district court granted summary judgment on each of these claims.

The "additional claims" included Holtz's allegations of religious and national origin discrimination and retaliation in the form of denial of bonus and overtime and failure to promote or transfer. The court concluded that it lacked jurisdiction over all these claims except the failure to promote claim because Holtz failed to raise them in

her EEOC complaint. The court dismissed the failure to promote claim on its merits.

This appeal followed.

## DISCUSSION

### I. Claims Included in the EEOC Charge

#### A. Sexual Harassment

*1. Local Rule 56.1.* Before reaching the merits of Holtz's sexual harassment claim, we pause to consider a procedural issue raised by RCI. Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit "a separate, short and concise statement" setting forth material facts as to which there is no genuine issue to be tried. *See* Local Rule 56.1(a). A party opposing summary judgment must respond with a statement of facts as to which a triable issue remains. *See* Local Rule 56.1(b). The facts set forth in a moving party's statement "will be deemed to be admitted unless controverted" by the opposing party's statement. Local Rule 56.1(c).

RCI, as the moving party, submitted a statement of allegedly undisputed facts pursuant to Local Rule 56.1(a), but Holtz did not respond with a statement of disputed facts pursuant to Local Rule 56.1(b). RCI's statement alleges, among other things, that Mumbach, whom Holtz accuses of having sexually harassed her, "never physically touched Holtz" except on the hand and "never physically touched Holtz . . . in a sexual or offensive manner." RCI asserts that the district court was required to accept these allegations as admitted facts and therefore to grant summary judgment on the sexual harassment claim.

RCI's assertions, if accepted as true, might justify the dismissal of the sexual harassment claim. In the absence of sexually suggestive or offensive physical contact, the pattern of conduct alleged by Holtz would consist only of verbal remarks that might not rise to a Title VII violation. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). And we have affirmed the grant of summary judgment on the basis of uncontested assertions in the moving party's Local Rule 56.1 statement. *See, e.g., Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir.2000); *see also Gubitosi v. Kapica*, 154 F.3d 30, 31 n. 1 (2d Cir.1998) (accepting as true defendant's uncontested assertions in reversing denial of summary judgment).

■ We nonetheless reject RCI's argument. A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules. *See Wight v. Bankamerica Corp.*, 219 F.3d 79, 85 (2d Cir.2000); *Somlyo v. J. Lu–Rob Enters.*, 932 F.2d 1043, 1048 (2d Cir.1991). Thus, we have previously indicated, and now hold, that while a court "is not required to consider what the parties fail to point out" in their Local Rule 56.1 statements, it may in its discretion opt to "conduct an assiduous review of the record" even where one of the parties has failed to file such a statement. *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir.2000) (internal citations and quotation marks omitted); *see also Prunella v. Carlshire Tenants, Inc.*, 94 F.Supp.2d 512, 513 n. 1 (S.D.N.Y.2000) (declining to deem admitted facts contained in defendant's Local Rule 56.1 statement where plaintiff failed to file responsive statement); *Cello Holdings, L.L.C. v. Lawrence–Dahl Cos.*, 89 F.Supp.2d 464, 469 (S.D.N.Y.2000) (same); *Local Union No. 38 v. Hollywood Heating*

*& Cooling, Inc.*, 88 F.Supp.2d 246, 247 n. 1 (S.D.N.Y.2000) (same).

The district court did not mention Holtz's failure to file a Local Rule 56.1 statement, and conducted at least some scrutiny of the record independent of RCI's Local Rule 56.1 statement. *See Holtz*, 1999 WL 1043866, at *5, 1999 U.S. Dist. LEXIS 17682, at *13. The court concluded from that review of the record that Holtz had failed to raise a triable issue on the sexual harassment claim. In reviewing that ruling, we take our cue from the district court, in whose discretion lay the initial determination not to apply Local Rule 56.1 to Holtz's failure to file a counter-statement, and review the record *de novo*.

■ We have a second reason to look past Holtz's failure to file a Local Rule 56.1 statement. RCI's allegations of uncontested fact cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement. Local Rule 56.1(d) provides that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible" as required by Fed. R.Civ.P. 56(e). Interpreting the predecessor to the current Local Rule 56.1, we held that "[a] Rule 9(g) statement by counsel on a motion for summary judgment cannot be a substitute for an affidavit as to the facts." *Zanghi v. Incorporated Village of Old Brookville*, 752 F.2d 42, 47 (2d Cir. 1985). Likewise, district courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that "where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." *Watt v. New York Botanical Garden*, No. 98 Civ. 1095(BSJ), 2000 WL 193626, at *1 n. 1, 2000 U.S. Dist. LEXIS 1611, at *2 n. 1 (S.D.N.Y. Feb. 16,

2000); *see also IBS Ketel, Ltd. v. Korea Telecom Am., Inc.*, No. 98 CIV. 4856(DC), 2000 WL 821013, at *1 n. 1, 2000 U.S. Dist. LEXIS 8678, at *1 n. 1 (S.D.N.Y. June 22, 2000); *Am. Auto. Assn. v. AAA Auto. Club of Queens, Inc.*, No. 97 CV 1180 SJ, 1999 WL 97918, at *3, 1999 U.S. Dist. LEXIS 8892, at *7 (E.D.N.Y. Feb. 8, 1999); *Rivera v. Nat'l R.R. Passenger Corp.*, 152 F.R.D. 479, 484 (S.D.N.Y.1993). Allowing a Local Rule 56.1 statement to substitute for the admissibility requirement set forth in Fed.R.Civ.P. 56(e) "would be tantamount to the tail wagging the dog." *Rivera*, 152 F.R.D. at 484.

■ The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties. *See Monahan*, 214 F.3d at 292; *Watt*, 2000 WL 193626, at *1 n.1, 2000 U.S. Dist. LEXIS 1611, at *2 n.1. The local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record. Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.[1] *See Zanghi*, 752 F.2d at 47.

Neither of the key factual contentions in RCI's Local Rule 56.1 statement—that Mumbach only touched Holtz's hand, and that none of the physical conduct was "sex-

ual or offensive"—is supported by the portions of the record cited within the statement or by the record as a whole. Holtz testified that Mumbach touched her hair as well as her hand, and the portion of the record cited by RCI in its Local Rule 56.1 statement does not suggest otherwise. The statement that Mumbach's touching was never sexual or offensive is similarly unsupported by the cited deposition testimony. That testimony indicates only that Holtz believed one particular form of Mumbach's conduct—his tendency to "come much, much too close to [her]"— was caused by something other than an intent to harass her. Holtz's testimony did *not* relate to Mumbach's alleged touching of her hand, which she considered an intentional and "unwanted sexual advance."

We thus decline to deem as admitted the assertions made by RCI in its Local Rule 56.1 statement that Mumbach's physical contact with Holtz was limited to touching her hand and not "sexual or offensive," and we review the record on this claim *de novo*.

■ 2. *Sexual Harassment under Title VII*. An employer violates Title VII's prohibition of discrimination on the basis of sex when it allows the working environment to become "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d

---

1. To hold otherwise would risk creating tension between Local Rule 56.1 and Fed. R.Civ.P. 56, which permits a district court to grant an unopposed motion for summary judgment only when it is "appropriate," i.e., only when "the ... admissions on file ... show that ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(c), (e). In other words, "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Fed.R.Civ.P. 56(e), Advisory Committee Note to 1963 Amendment.

295 (1993) (citations and internal quotation marks omitted). "[I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275.

 In determining whether a work environment is sufficiently hostile or abusive to violate Title VII, we " 'look[] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Id.* at 787–88, 118 S.Ct. 2275 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). Title VII is not "a general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (citation and internal quotation marks omitted). The incidents of allegedly offensive conduct must also be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.,.* 115 F.3d 143, 149 (2d Cir.1997) (citation and internal quotation marks omitted).

 *3. Merits.* The district court granted summary judgment on Holtz's sexual harassment claim, stating that Mumbach's alleged conduct, "although perhaps boorish and inappropriate, do[es] not rise to the level of harassment." *Holtz*, 1999 WL 1043866, at *5, 1999 U.S. Dist. LEXIS 17682, at *12–*13. The court relied principally on what it saw as Holtz's

failure to establish that Mumbach had touched her intentionally or requested sexual favors. We disagree.

 The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact. *See, e.g., Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir.1997). Summary judgment is appropriate only if it can "be concluded as a matter of law that no rational juror could view [the defendant's conduct] as ... an intolerable alteration of [the plaintiff's] working conditions." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir.2000); *accord, e.g., Brennan v. Met. Opera Ass'n, Inc.*, 192 F.3d 310, 319 (2d Cir.1999).

Were a rational jury to credit Holtz's version of the events, it could find that Mumbach's conduct crossed the line between "boorish and inappropriate" behavior and actionable sexual harassment. Although that line is admittedly indistinct, its haziness counsels against summary judgment in this case. "An Article III judge is not a hierophant of social graces. Evaluation of ambiguous acts such as those revealed by the potential evidence in this case presents an issue for the jury." *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir.1998).

Holtz testified that Mumbach "grabb[ed]" and "placed his hand on [her] hand" on a "daily" basis, "constantly," "whenever he had the opportunity," "every time [she] would try to hand him a paper," and that he "used to touch [her] hair a lot." This conduct "was ongoing over months and months." While the alleged physical contact resulted in no physical injury, if it in fact occurred in the manner in which Holtz described it, a jury could find that it was objectively reasonable for her to view it as offensive, hostile or abusive in light of (1) its frequency and duration, (2) the fact that Mumbach touched no other person in

this way, and (3) the background context of Mumbach's other alleged sexually suggestive conduct, including "obscene leers," repeated efforts to peek underneath Holtz's clothing, and a pattern of teasing comments about her sex life.

As to the requirement that the alleged harassment be subjectively offensive, Holtz asserts, and RCI is hard put at this stage of the proceedings to disprove, that she found this conduct offensive. She testified that she interpreted Mumbach's comments as accusing her of being "a loose woman"; that she asked Mumbach to stop and complained of his conduct to her superiors; that she "burst into tears" when describing his conduct to Massimo; and that two years after she left RCI, she still became physically and emotionally distressed talking about the alleged harassment. These sworn assertions, if credited by a trier of fact, would suffice to show that Holtz was subjected to a hostile work environment. The alleged conduct arguably was "both objectively and subjectively offensive" such that a jury could conclude that "a reasonable person would find [it] hostile or abusive, and ... the victim did in fact perceive [it] to be so." *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275.

There is also a triable issue as to whether Mumbach's alleged conduct " 'unreasonably interfere[d] with [Holtz's] work performance.' " *Id.* at 788, 118 S.Ct. 2275 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). Holtz testified that "it [was] almost impossible for [her] to do [her] work without getting upset" when the harassment occurred.

We thus conclude that the district court erred in granting summary judgment to RCI on Holtz's hostile work environment claim.

### B. Failure to Train Because of Age

Holtz alleges that when Cowan hired her, he promised to provide her with train-ing as an accountant but that he later refused to do so because of her age. The district court granted summary judgment on this claim on the ground that Holtz failed to show that she was treated differently than were similarly situated co-employees. We conclude that the district court incorrectly applied the burden-shifting analysis applicable to discrimination claims. Properly applied, this analysis requires reversal.

 *1. Applicable Law.* The ultimate issue in an ADEA case is whether the plaintiff has proved by a preponderance of the evidence that "her age played a motivating role in, or contributed to, the employer's decision." *Renz v. Grey Advert., Inc.*, 135 F.3d 217, 222 (2d Cir.1997). Because direct evidence of discrimination—a " 'smoking gun' ... attesting to a discriminatory intent," *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991)—is typically unavailable, plaintiffs and courts ordinarily proceed by way of the three-part burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "[T]he allocation of burdens [under the *McDonnell Douglas* framework] and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

 Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). An ADEA plaintiff meets that burden by showing that (1) she

was within the protected age group, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) that action took place in circumstances giving rise to an inference of discrimination. *See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir.2000). "By making out this 'minimal' prima facie case, ... the plaintiff 'creates a presumption that the employer unlawfully discriminated,' and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000) (citations omitted).

■ If the defendant meets its burden, "the *McDonnell Douglas* framework ... disappear[s] and the sole remaining issue ... [is] discrimination *vel non.*" *Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097 (citations and internal quotation marks omitted).[2] The plaintiff must then meet her ultimate burden of proving that she was the victim of intentional discrimination without the benefit of *McDonnell Douglas's* intermediate burdens and presumptions. *Id.* at 143, 120 S.Ct. 2097.

■ *2. Analysis.* As noted, the district court dismissed Holtz's failure-to-train claim because she failed to show that she was treated differently than were other similarly situated employees. It is true that evidence of disparate treatment *may* establish the inference of discrimination necessary to satisfy a plaintiff's *prima facie* case under *McDonnell Douglas. See*

*Abdu–Brisson*, 239 F.3d at 467–68. But such evidence is not always necessary. *See id.* "[A] plaintiff may rely on direct evidence of what the defendant did and said" in satisfying her initial burden under *McDonnell Douglas. Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000); *see also Abdu–Brisson*, 239 F.3d at 468. We have held, for instance, that evidence that "the employer had told the employee that he was being fired because of his age[,] ... coupled with a firing (or refusal to hire) of a person in the protected age group, would support a finding that the firing was based on an impermissible criterion such as age." *Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921 (2d Cir. 1981).

Holtz has provided similar direct evidence in this case. She testified at her deposition that when Cowan discussed his plans to "give Colleen Ryan new duties and give her more responsibilities, ... he went on at some length about how he was grooming Colleen and training her and she was a good employee to invest in because she was a young girl, a young woman." Holtz testified further that on a different occasion Cowan "called [her] in and told [her] how much he enjoyed training young women and he mentioned Colleen Ryan and Paula Aviles." Even more pointedly, Holtz testified that when she would raise the particular subject of her training and ask, "'When are we going to have these sessions in which you teach me the basics

---

**2.** Judge Brieant has compared the disappearance of the *McDonnell Douglas* framework at this point in the analysis to the disappearance of the Cheshire Cat in *Alice in Wonderland. See Bickerstaff v. Vassar College*, 992 F.Supp. 372, 373 & n. 2 (S.D.N.Y.1998) (citing and quoting Lewis Carroll, *Alice in Wonderland* (1865), Ch. 6: "The Cheshire Cat kept appearing and vanishing so suddenly that Alice complained '... I wish you wouldn't keep appearing and vanishing so suddenly: you

make one quite giddy.' 'All right,' said the cat; and this time it vanished quite slowly beginning with the end of the tail, and ending with the grin, which remained some time after the rest of it had gone. 'Well! I've often seen a cat without a grin,' thought Alice; 'but a grin without a cat! It's the most curious thing I ever saw in my life!' "), *aff'd*, 196 F.3d 435 (2d Cir.1999), *cert. denied*, 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000).

of accounting,' he would say, 'Oh, Laura, it's young women I like to train.'" Holtz testified, moreover, that these incidents were not isolated. Throughout her employment, there were "always kind of these [sic] references to how he liked training young women," she said.

Holtz's testimony is the only evidence in the record directly ascribing discriminatory intent to Cowan or RCI, and consists largely of her uncorroborated accounts of what Cowan said. We nonetheless conclude that her statements raise a genuine issue of fact as to the defendant's intent. *See Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410 (2d Cir.) (stating that employer's contention that plaintiff's proffered evidence of discriminatory comments "is uncorroborated and not credible is a jury argument inappropriate on a motion for summary judgment"), *cert. denied*, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991); *Sorlucco v. New York City Police Dep't*, 888 F.2d 4, 7 (2d Cir.1989) ("The plaintiff may preclude summary judgment by producing evidence from which the trier of fact reasonably could draw an inference of discrimination.").

Having concluded that Holtz failed to make out a *prima facie* case because there was no evidence of disparate treatment, the district court proceeded no further in its *McDonnell Douglas* analysis, that is, it did not consider whether RCI had articulated a legitimate, non-discriminatory reason for failing to train Holtz and, if so, whether Holtz nonetheless met her burden of raising a triable issue of fact as to whether RCI engaged in intentional discrimination. Without addressing these issues explicitly, RCI suggests that there was a legitimate explanation for Cowan's refusal to train Holtz in accounting, namely, that she was not qualified for a staff accounting position. Even if true, howev-

er, this assertion does not necessarily defeat Holtz's claim that because of her age, she was not given the training promised her when she was hired. Holtz's evidence that the promise was made and that age was at least a substantial part of the motivation for the denial of training is sufficient to defeat summary judgment.

■ The dissent asserts that Holtz's testimony regarding Cowan's comments is insufficient to carry her burden at the final stage of the *McDonnell Douglas* analysis. We understand the dissent to argue that as part of this burden, Holtz was required to show that RCI's proffered justification for not giving her accounting training was false by showing, for example, that others similarly situated but for age were given the training to which Holtz insists she was entitled. We disagree.

■ We first note that just as evidence of disparate treatment is not an essential element of a *prima facie* case of discrimination, *see Abdu–Brisson*, 239 F.3d at 467–68, such evidence is also not always necessary at the final stage of the *McDonnell Douglas* analysis. *See, e.g., Owens*, 934 F.2d at 410 (holding that evidence of remarks by employer reflecting discriminatory motive was sufficient to "raise[] a triable issue as to whether the articulated reasons for [the employer's conduct] were pretextual."). To defeat summary judgment within the *McDonnell Douglas* framework, moreover, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir.1995); *see also Reeves*, 530 U.S. at 147, 120 S.Ct. 2097; *Bickerstaff v. Vassar College*, 196 F.3d 435, 447 (2d Cir.1999), *cert. denied*, 530 U.S. 1242, 120 S.Ct. 2688,

147 L.Ed.2d 960 (2000); *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 120 (2d Cir.1997). The plaintiff's burden in this regard "may often be carried by reliance on the evidence comprising the prima facie case, without more." *Cronin,* 46 F.3d at 203.

 Of course, RCI may still raise the defense articulated by the dissent— that it would have refused to train Holtz regardless of her age. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568–69 (2d Cir.1989). But the validity of this defense is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment. *See Cronin,* 46 F.3d at 203. For the reasons set forth in the dissent, Holtz may have a distinctly uphill battle on these issues at trial. But we conclude that as to this claim, she is entitled to such a trial and that summary judgment was improperly granted to the defendant.

## C. Retaliatory Discharge

Holtz also contests the district court's grant of summary judgment on the claim that she was fired in retaliation for complaining to Massimo and others about Mumbach's alleged sexual harassment.

 *1. Prima Facie Case.* To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show "(1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998); *see McMenemy v. City of Rochester,* 241 F.3d 279, 282–83 (2d Cir.2001).

Holtz's termination[3] occurred shortly after she complained to Massimo, the Director of Human Resources, about her confrontation with Cowan. That confrontation, in turn, arose from Holtz's desire to avoid interaction with Mumbach, whom she alleges was sexually harassing her. Massimo investigated the incident, and her ensuing conversations with Holtz about the investigation and more broadly about Holtz's stated desire to leave RCI eventually led to Holtz's termination by Massimo and John Leyden, RCI's Chief Financial Officer.

The district court apparently concluded that Holtz's complaint to Massimo consisted only of the accusation that Cowan had humiliated her in front of her coworkers. *See Holtz,* 1999 WL 1043866, at *5, 1999 U.S. Dist. LEXIS 17682, at *14–*15. The court seemed to be of the view that the complained of conduct, thus limited, could not objectively be viewed as discriminatory, and that Holtz's complaint therefore did not constitute protected activity upon which a retaliation claim could be based. *See McMenemy,* 241 F.3d at 285 ("The plaintiff is . . . required to have had a good faith, reasonable belief that [s]he was opposing an employment practice made unlawful by Title VII.").

 But Holtz's alleged protected activity included more than her complaints to Massimo about being humiliated by Cowan. We conclude that Holtz raised a

---

**3.** RCI argued to the district court that Holtz resigned rather than being terminated. The district court assumed that Holtz was "'forced' to resign," *Holtz,* 1999 WL 1043866, at *6, 1999 U.S. Dist. LEXIS 17682, at *27, an assumption that RCI does not appear to contest on appeal.

triable issue as to whether she engaged in additional protected activity by complaining of activity that she believed in good faith was illegal, and that the persons responsible for her termination were aware of her complaints. For instance, the record could support a finding that Holtz complained of sexual harassment by Mumbach during the June 29, 1995 meeting with Massimo regarding her confrontation with Cowan. Holtz testified that she "went to Human Resources about [Mumbach's] sexual harassment," and that she "burst into tears" when trying to describe Mumbach's conduct to Massimo. Because, as discussed, Holtz's allegations regarding Mumbach's conduct were sufficient to support a harassment claim, her complaints about such conduct to RCI officials were also sufficient to support a retaliation claim with respect to subsequent employment actions taken against her.

There also is no dispute that at the July 17, 1995 meeting with Massimo and Leyden in which her termination was effectively announced, she complained that she "had been the subject of illegal treatment."

Equally important, the record included several indications that Holtz had complained of Mumbach's alleged harassment before June 1995, and that Massimo and Leyden knew of those complaints. It is undisputed that Massimo was aware that Holtz had complained to Cowan about "very serious" problems, and had claimed that she was being "abused" by people who were "making accusations about her and older men." Cowan claimed that Holtz said the alleged abusers were "not ... in [Cowan's] department," but Holtz claims otherwise. Leyden also knew generally of Holtz's complaints about Mumbach. Holtz further claims that she had complained to Canterbury that Mumbach had made "unwanted sexual advances." Canterbury admits discussing Mumbach's

behavior with Holtz, but she denies that Holtz alleged that she was being sexually harassed.

Read in the light most favorable to Holtz, see Tenenbaum, 193 F.3d at 593, this record could support the following version of events. Holtz's refusal to interact with Mumbach, the alleged perpetrator of sexual harassment against her, led to a confrontation with Cowan, to whom she had complained about the harassment. Cowan's angry insistence that Holtz deal directly with Mumbach notwithstanding her discomfort led to conversations with Massimo and Leyden, both of whom knew or soon learned of Holtz's complaints regarding Mumbach. After Massimo investigated the confrontation and had a conversation in which Holtz made allegations of "illegal treatment," she and Leyden essentially forced Holtz to resign.

Under these circumstances, a jury could find that Holtz was engaged in protected activity, that her employer was aware of that activity, and that there was "a causal connection between the protected activity and the adverse action." Galdieri–Ambrosini, 136 F.3d at 292. Holtz thus met her prima facie burden.

■ 2. Estoppel. RCI asserts that Holtz is estopped from alleging that she complained to Massimo of sexual harassment because she testified under oath before the state Unemployment Insurance Appeal Board ("UIAB") that the only subject of her complaint was Cowan's alleged public humiliation of her. RCI relies on Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6–8 (2d Cir.1999). In Mitchell, we held that a party may be estopped from asserting a position if "(1) the party ... took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." Id. at 6 (citations omitted).

We also held that "statements to administrative agencies ... may ... give rise to judicial estoppel." *Id.*

We reject RCI's estoppel argument. The issue before the UIAB was whether Holtz had been terminated, and thus eligible for unemployment benefits, or whether she resigned. The UIAB found she had been fired. That tribunal did not, on the basis of Holtz's testimony or otherwise, adopt a position inconsistent with the argument Holtz advances in this litigation, that she had complained to Massimo and others that she had been sexually harassed.

3. *RCI's Proffered Reason for the Discharge.* Once Holtz made out a *prima facie* case of retaliation, the burden shifted to RCI to articulate a legitimate, non-discriminatory reason for the allegedly retaliatory act. *See Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 443 (2d Cir.1999). RCI met this burden by linking Holtz's termination to her long-held and oft-repeated intention to leave RCI's employ in the near future. Indeed, Holtz told Massimo that she was actively looking for another job. Massimo stated that in light of Holtz's plans, the company was concerned that she would quit on short notice and leave them short of trained staff during a particularly busy season. Holtz has offered no reason to conclude that such concerns were unfounded.

After each party has satisfied her or its initial burdens under *McDonnell Douglas,* the plaintiff's ultimate burden of persuasion is the burden she bore from the outset—to persuade the trier of fact that she was the subject of illegal discrimination. *See Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. The plaintiff then has the "opportunity" to demonstrate that the employer's proffered reason "was not the true reason for the employment decision." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. But proof that the employer's proffered justification is false, however persuasive, "is simply one form of circumstantial evidence that is probative of intentional discrimination." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 517, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). As noted, the plaintiff may instead rely on evidence—circumstantial or otherwise—showing that "an impermissible reason was 'a motivating factor,' without proving that the employer's proffered explanation" played no role in its conduct. *Fields,* 115 F.3d at 120; *see also Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *Cronin,* 46 F.3d at 203. In some cases, then, the "plaintiff's evidence establishing a *prima facie* case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir. 2000); *see also Cronin,* 46 F.3d at 203.

Accordingly, Holtz's failure to show that RCI's stated reason for her discharge was false was not fatal on this record. A rational jury could conclude from the circumstances of her termination—the fact that it grew directly out of a dispute that may have been related to her complaints of sexual harassment, and the evidence that the persons who made the decision to terminate Holtz may have known of those complaints—that retaliation for protected activity "was *a* substantial motivating factor" for the adverse employment action. *Fields,* 115 F.3d at 121 (emphasis in original). Of course, a jury could also discredit the evidence of improper motive, or could conclude, if so charged at RCI's request, that RCI would have terminated Holtz irrespective of its employees' desire to retaliate for her pro-

tected activity. *See Price Waterhouse*, 490 U.S. at 244–45, 109 S.Ct. 1775. But those are questions "to be resolved by the fact-finder after trial." *Cronin*, 46 F.3d at 203.

## D. Discriminatory Discharge

To establish a *prima facie* case of discriminatory discharge under the classic *McDonnell Douglas* framework, "the plaintiff must show that [she] was (1) within the protected age group; (2) qualified for the position; (3) discharged; and (4) that such discharge occurred under circumstances giving rise to an inference of discrimination." *Carlton*, 202 F.3d at 134.

 As the district court correctly observed, the plaintiff failed to raise an inference that she was discharged because of her age. Neither Massimo nor Leyden, the RCI employees responsible for Holtz's termination, made any discriminatory remarks or otherwise exhibited signs that they were motivated by Holtz's age. Nor has Holtz shown that similarly situated employees were treated differently or that she was replaced by a younger person, or adduced any other circumstantial evidence indicative of discriminatory intent. Summary judgment on this claim was thus properly granted.

## II. Additional Claims

The district court concluded that Holtz's EEOC charge alleged only failure to train

because of age, sexual harassment, retaliatory discharge, and an implied claim of wrongful termination. The district court classified as "additional claims" several allegations which, according to the court, first appeared in the complaint in this action, after the EEOC proceedings were concluded—the claims of discrimination on the basis of religion and national origin, failure to promote or transfer, and denial of bonus and overtime pay.

 The district court noted that all of these claims were likely untimely, but declined to rest its dismissal on that ground because of "sensitiv[ity] to plaintiff's *pro se* status." *Holtz*, 1999 WL 1043866, at *2, 1999 U.S. Dist. LEXIS 17682, at *5.[4] The court concluded, however, that it lacked jurisdiction[5] over the additional claims, except those alleging failure to promote and transfer, because Holtz had failed to exhaust her administrative remedies. The court also dismissed the failure to promote and transfer claims on the merits. We affirm for substantially the same reasons, with one minor variation.

## A. Exhaustion of Remedies

 A plaintiff may bring an employment discrimination action under Title VII or the ADEA only after filing a timely charge with the EEOC or with "a State or

---

**4.** Because we affirm the court's ruling, we need not review this issue. We note, however, that *pro se* attorneys such as Holtz typically "cannot claim the special consideration which the courts customarily grant to *pro se* parties." *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir.1981).

**5.** We have previously referred to a plaintiff's effort to assert claims not previously raised in an EEOC charge as a matter of "jurisdiction." *See, e.g., Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993) (Title VII). But we recently made clear that "the failure to exhaust administra-

tive remedies is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement." *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir.2000) (internal quotation marks and citations omitted). The district court issued its decision in this case before *Francis* and thus understandably viewed Holtz's failure to exhaust her remedies as a jurisdictional defect. Because we conclude that all of the additional claims were properly dismissed, the distinction drawn by *Francis* has no substantive impact on our resolution of this appeal.

local agency with authority to grant or seek relief from such practice." 42 U.S.C. § 2000e–5(e) (Title VII); *see* 29 U.S.C. §§ 626(d), 633(b) (ADEA). Exhaustion of remedies is a precondition to suit, *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir.2000), and a plaintiff typically may raise in a district court complaint only those claims that either were included in or are "reasonably related to" the allegations contained in her EEOC charge. *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993) (internal quotation marks omitted) (Title VII); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1208 (2d Cir.1993) (ADEA).

■ A claim raised for the first time in the district court is "reasonably related" to allegations in an EEOC charge "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts*, 990 F.2d at 1402 (internal quotation marks omitted). We have described this as "essentially an allowance of loose pleading." *Id.*[6]

Holtz asserts that the "additional claims" were not new, but were spelled out in two "affidavits" she filed with the EEOC after filing her formal charge on September 6, 1995. The first such document purportedly was filed "shortly after" the formal charge. The record includes no evidence of the content of that document, and thus we are in no position to evaluate whether it raised the "additional claims."

■ The second "affidavit" does appear in the record. It includes allegations that RCI discriminated against Holtz on the basis of her religion and national origin, and by denying her a bonus and fail-

ing to promote her. If considered part of the original EEOC charge, such allegations would be sufficient to allow Holtz to raise nearly all the "additional claims" in her complaint.

This second "affidavit," however, is an unsworn letter mailed to the EEOC on October 8, 1996, more than a year after the initial EEOC charge was filed. Holtz offers no authority for allowing such submissions to form part of the original charge and to enlarge its scope to include new claims. EEOC regulations do allow "written statements" of fact to amend a charge, but only insofar as they "clarify and amplify allegations made" in the original charge or "alleg[e] additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge." 29 C.F.R. § 1601.12(b) (Title VII); *cf.* 29 C.F.R. § 1626.8 (setting forth similar requirements for EEOC charges alleging violations of ADEA).

We hold that Holtz's second "affidavit" was entitled to consideration only to the extent that it could be deemed an amendment to the original charge within the meaning of § 1601.12(b) rather than a new charge. *See Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 502 (7th Cir.1994). The affidavit thus could not enlarge the scope of the charge to encompass new unlawful employment practices or bases for discrimination. Consequently, with two exceptions discussed below, Holtz raised the "additional claims" for the first time before the district court. These claims were accordingly barred unless "reasonably related" to the allegations in her EEOC charge.

---

6. We have recognized two other types of "reasonably related" claims: those alleging "retaliation by an employer against an employee for filing an EEOC charge," and those alleging "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts*, 990 F.2d at 1402–03. Neither party contends that the additional claims fit these descriptions.

## B. Specific Additional Claims

 *1. Religious Discrimination and Denial of Bonus and Overtime.* The district court properly dismissed Holtz's claim that she was denied a bonus and overtime pay in retaliation for her complaints about Mumbach's alleged sexual harassment. This claim bears no factual or legal relation to the allegations in the EEOC charge and would not naturally be addressed in the course of an EEOC investigation into such allegations. The same is true of Holtz's claim of religious discrimination, about which the EEOC charge is entirely silent.

 *2. National Origin.* The EEOC charge did, however, effectively put the agency and RCI on notice that Holtz was alleging national origin discrimination. On the form she submitted to the EEOC, she checked a box indicating that the discrimination was based on her national origin. She also stated that she was of "English–German national origin," that she had not been trained as promised, and that her supervisor "hired and trained women … who were of Irish national origins."

 We nonetheless affirm the dismissal of the national origin claim because the record is barren of any evidence that Holtz suffered discrimination on this basis. Holtz's chief complaint is that her supervisor and several co-workers formed "a little clique of Irish people and they would talk about being Irish a lot," and that she was "out of the loop." Such allegations fall well short of the sort of "materially adverse change in the terms and conditions of employment" that entitles a plaintiff to damages under Title VII. *Richardson*, 180 F.3d at 446.

 *3. Failure to Promote.* The district court concluded that Holtz's claim that RCI failed to promote and transfer her for retaliatory reasons was "reasonably related" to her failure to train claim. As the district court stated, it would have been "reasonable to suspect that the EEOC, in investigating [Holtz's] complaint of failure to train because of age, would have assessed [RCI's] promotion and transfer policies." *Holtz*, 1999 WL 1043866, at *3, 1999 U.S. Dist. LEXIS 17682, at *7. The district court nonetheless dismissed this claim on the merits, and we affirm.

Holtz applied for but was denied two positions: one with RFS, and one with the Rockefeller Brothers Fund. The record shows that both companies, while falling under the Rockefeller umbrella, were separate legal entities and not owned by Holtz's employer, RCI. Holtz conceded as much in her deposition. She does not allege that she applied for and was denied any open position within RCI itself.

RCI did provide "personnel services" to RFS, including "administrative support for staffing." The district court found that Canterbury—the Manager of Personnel Administration for RCI who arranged Holtz's interview with RFS—"could have hired plaintiff for a position with RFS had one been available." *Holtz*, 1999 WL 1043866, at *3, 1999 U.S. Dist. LEXIS 17682, at *9. By extension, had Canterbury played any role in denying Holtz a position at RFS for discriminatory reasons, perhaps RCI could have been held liable. But there is no evidence that RFS's refusal to hire Holtz was at all related to her complaints. Holtz testified only that she "did not get the position" and that it was given to another woman.

The only allegedly discriminatory conduct occurred with respect to the position at the Rockefeller Brothers Fund. There is no dispute that the Rockefeller Brothers Fund is legally distinct from RCI, and no allegation that any RCI employee played a

part in the former company's decision not to hire Holtz.

In short, Holtz's failure to promote or transfer claims fail for the simple reason that the allegedly discriminatory conduct was not attributable to her employer.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

Each party shall bear her or its own costs.

STRAUB, Circuit Judge, dissenting in part.

I concur with the majority opinion in all but one respect. However, because I believe that the District Court correctly dismissed Ms. Holtz's claim of age discrimination based on RCI's failure to train, I respectfully dissent from that portion of the majority opinion.

Ms. Holtz claims that RCI discriminated against her because of her age when it failed to train her in the principles of accounting. She alleges that the company promised that it would train her to be an accountant; but that promise was never fulfilled because her supervisor preferred to train younger women. To support her claim, she relies solely on statements attributed to her supervisor that he preferred to train only younger women. As noted by the majority, this claim must be assessed according to the burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, if RCI is able to proffer a legitimate, non-discriminatory justification for its actions, the burden shifts to Ms. Holtz to prove discrimination by demonstrating that the justification proffered by RCI was

pretextual. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). This, I believe, is where Ms. Holtz's claim falls short.

To set the stage for this claim, it should be remembered that Ms. Holtz made it abundantly clear that she had no intention of remaining at RCI or ever serving in an accountant position for the company. Although trained as a lawyer, Ms. Holtz accepted a position at RCI as a temporary secretary and later as an invoice processor. While there she openly interviewed for positions with other companies and announced her intention to remain at RCI only until she found a position more suitable to her interests and education. The evidence clearly shows that she wanted neither to remain an invoice processor nor become an accountant with RCI. Despite all this, she now seeks monetary damages because the company discriminated against her when it did not invest in training her in the principles of accounting.

In response, RCI asserts that it did not train Ms. Holtz for an accountant position because she was unqualified for such a position. According to company policy, only persons with accounting degrees are qualified to be company accountants. Although the evidence supporting RCI's claimed policy is far from overwhelming, it is uncontroverted and I believe sufficient to satisfy RCI's burden. For example, at least two RCI executives, including the company's manager of personnel, asserted in affidavits that accounting degrees were a prerequisite for accountant positions within the company. Because Ms. Holtz concedes that she does not possess the prerequisite accounting degree, RCI was justified in not training Ms. Holtz for a position for which she was not qualified.

Once RCI made its requisite showing, the burden shifted to Ms. Holtz to produce

evidence that the justification cited by RCI was pretextual. She could do this, for example, by demonstrating that other similarly situated persons were provided with the training that she desired. While Ms. Holtz cites several other individuals to whom RCI provided accounting training, none are similarly situated because all had the requisite education to qualify for an accounting position. Nor did Ms. Holtz offer any other evidence suggesting that RCI did not in fact have or enforce the claimed policy.

To be clear, although Ms. Holtz's claim is that she was denied promised *training* in accounting because of her age rather than being denied the opportunity to serve in the *position* of an accountant, this is a distinction without meaning. It is true that RCI cannot deny an employee benefit (such as training) because of the age of an employee. But the question here is whether RCI met its burden under *McDonnell Douglas* by providing a legitimate, non-discriminatory justification for not training Ms. Holtz. Surely, a company may legitimately decide to not invest in training an employee (particularly an employee who has no intention of remaining with the company) for a position that the employee can never hold. In order to create a genuine factual issue for jury determination, Ms. Holtz must rebut that justification. This Ms. Holtz has not done.

Thus, even if a jury were to credit all of Ms. Holtz's allegations—which are little more than uncorroborated second hand statements attributed to her supervisor—the independent reason cited by RCI for not training Ms. Holtz (she was not qualified) would still provide a non-discrimina-

tory justification for its actions. It, I believe, is inadequate for Ms. Holtz to simply point to the evidence which established her *prima facie* case when that evidence does not rebut the independent and sufficient justification offered by RCI. In the absence of evidence rebutting RCI's non-discriminatory policy, summary judgment on this claim was entirely appropriate.

Accordingly, I believe that the District Court properly dismissed this claim.[1]

---

1. Of course, if RCI made specific promises to train Ms. Holtz in order to induce her to accept employment, these promises may constitute contractual obligations which were breached by RCI. But a claim based on con-

tract law is very different from a discrimination claim. Broken promises should not preclude the District Court from dismissing her discrimination claim.